COMMONWEALTH of Kentucky, TRANSPORTATION CABINET, DEPARTMENT OF HIGHWAYS, Appellant,

v.

Robin L. BABBITT, Special Administrator of the Estate of Michael Roy Bender; Larry Logsdon; Jane Foley Nash, Special Administrator of the Estate of Cecilia Ann Bender; and Kentucky Board of Claims, Appellees,

and

Brandon Taylor, Personal Representative of the Estate of Sherry Taylor, Appellant,

v.

Commonwealth of Kentucky, Department of Highways, Transportation Cabinet; and Commonwealth of Kentucky, Board of Claims, Appellees.

Nos. 2003–SC–0556–DG, 2003–SC–0586–DG.

Supreme Court of Kentucky.

Sept. 22, 2005.

Stewart Burch, Kevin Patrick Fox, Logan and Gaines, Frankfort, Counsel for Appellant Commonwealth of Kentucky, Transportation Cabinet, Department of Highways (2003–SC–0556–DG).

James T. Gilbert, Coy, Gilbert and Gilbert, Richmond, Counsel for Appellees Robin L. Babbitt, Special Administrator of the Estate of Michael Roy Bender; Larry Logsdon; and Jane Foley Nash, Special Administrator of the Estate of Cecilia Ann Bender (2003–SC–0556–DG).

G. Mitchell Mattingly, Legal Counsel, Board of Claims, Frankfort, Counsel for Appellee Kentucky Board of Claims (2003–SC–0556–DG).

Charles E. Moore, Travis Leon Holtrey, Moore, Malone, and Safreed, Owensboro,

Counsel for Appellant Brandon Taylor, Personal Representative of the Estate of Sherry Taylor (2003–SC–0586–DG).

James R. Wood, General Counsel, Transportation Cabinet, Frankfort, Frank Miller, Jr., Weber & Rose, Louisville, Counsel for Appellee Commonwealth of Kentucky, Department of Highways, Transportation Cabinet (2003–SC–0586–DG).

G. Mitchell Mattingly, Legal Counsel, Board of Claims, Frankfort, Counsel for Appellee Commonwealth of Kentucky, Board of Claims (2003–SC–0586–DG).

Opinion of the Court by Justice COOPER.

These two appeals are from separate decisions of the Board of Claims, KRS 44.070, *et seq.*, denying claims for damages allegedly caused by the Transportation Cabinet's failure to provide warnings and/or erect guardrails at the scenes of two different single-vehicle accidents. In each case, the Board concluded that the negligence of the vehicle's operator was the sole cause of the *accident* without addressing whether any negligence on the part of the Cabinet was a contributing cause of the *damages* sustained because of the accident. In the *Babbitt* case, the Madison Circuit Court reversed and remanded with directions to apportion causation and award damages, and the Court of Appeals affirmed. In the *Taylor* case, both the Daviess Circuit Court and the Court of Appeals affirmed the Board's denial of the claim. Perceiving an inconsistency in the respective decisions of the Court of Appeals, we granted discretionary review of both cases.

### I. *BABBITT.*

The accident in *Commonwealth, Transportation Cabinet v. Babbitt, et al.,*

No.2003–SC–0556–DG, 172 S.W.3d 786 (Ky.2005) occurred on Interstate Highway 75 (I–75) in Madison County, Kentucky, at approximately 6:10 p.m. on November 17, 1989. Judy Logsdon was operating a Skamper motor home in the right southbound lane of I–75 with her husband, Larry Logsdon, her daughter and son-in-law, Cecelia[1] and Michael Bender, and the Benders' two infant children as passengers. Logsdon encountered a construction zone between mile point (M.P.) 88 and M.P. 77 where Allen Company, a paving contractor, was repaving the southbound lanes pursuant to a contract with the Transportation Cabinet. The paving of the highway, itself, had been completed, and both southbound lanes were open to traffic. However, reconstruction of the right shoulder of the highway was incomplete, and the white edge line between the right southbound lane and the ten-foot-wide paved shoulder had not been repainted. An acceleration lane from a roadside rest area merges with the right southbound lane just prior to M.P. 82. There were no "rumble strips"[2] at the point of merger or on the paved portion of the shoulder for 310 feet south of that point. To the right of the paved shoulder is a five-to-six-foot-wide earthen shoulder, then a drop-off to a ditch at the base of a rough-cut rock wall. The total distance from the outside edge of the right southbound lane to the rock wall is twenty-seven feet.

Mrs. Logsdon testified that she perceived the acceleration lane leading from the rest area to be a third southbound lane of highway and began driving to the right to make room for faster-moving traffic. She drove across the paved shoulder onto the earthen shoulder, then into the ditch where the motor home impacted with the rock wall. The mostly plywood body of the vehicle essentially disintegrated as it scraped along the rock wall before its chassis returned to the traveled portion of the highway. Larry Logsdon, Cecelia Bender, and Michael Bender were ejected from the vehicle, causing serious physical injuries to Mr. Logsdon and the deaths of Cecelia and Michael Bender. Mr. Logsdon and the Benders' estates brought civil actions in the Madison Circuit Court against Mrs. Logsdon, Allen Company, and Skamper Corporation, the manufacturer of the motor home, and this action in the Board of Claims against the Transportation Cabinet.[3] The claimants alleged that the Cabinet was negligent in failing to repaint the right edge line of the highway and replace the rumble strips, both of which would have warned Mrs. Logsdon that she was driving on the shoulder of the highway, and in failing to erect a guardrail between the shoulder and the drop-off to the ditch, which may have prevented the motor home from impacting the rock wall.

In 1989, the Transportation Cabinet generally adhered to guardrail guidelines established in the *Guide for Selecting, Locating, and Designing Traffic Barriers,* published in 1977 by the American Association of Highway and Transportation Officials (AASHTO), and the more recent

1. This person's name was spelled "Cecelia" in both the caption and body of the original complaint filed in the Board of Claims, and throughout the transcript of evidence. It is spelled "Cecilia" in the Motion for Discretionary Review. We assume the original spelling is correct.

2. "Rumble strips" are ridges on the paved portion of the shoulder that cause the vehicle

s tires to bump up and down ("rumble") to warn the driver that the vehicle is no longer on the traveled portion of the roadway.

3. The delay in the resolution of this claim was apparently due to the pendency of the Madison Circuit Court civil actions against the other defendants, all of which were ultimately settled.

*Roadside Design Guide* published in 1988 by AASHTO. However, since neither publication was officially adopted by statute or regulation, adherence to the guidelines was both unofficial and unrequired. AASHTO recommends a minimum "clear zone" of thirty feet between the edge of the roadway and a roadside hazard, a distance deemed sufficient to permit the operator of a "run-off-road" vehicle to regain control of the vehicle before reaching the hazard. The clear zone at the site of Logsdon's accident was only twenty-seven feet—and that included the ditch line. The Cabinet's expert testified that AASHTO recommends that guardrails not be erected if the surface of the rock wall is smooth, because an impact with the wall would cause no more damage than an impact with a guardrail, and the presence of the guardrail, itself, further reduces the width of the clear zone. He further testified that if the surface of the rock wall is rough-cut, as here, AASHTO provides that whether to erect a guardrail is a "judgment call."

AASHTO also recommends erection of a guardrail between the roadway and a drop-off within the clear zone if the slope of the drop-off exceeds a ratio of 4:1, the degree of slope from which a vehicle is deemed unable to recover. There was evidence that portions of the drop-off to the ditch adjacent to the rock wall at this accident site exceeded a slope ratio of 4:1. The Cabinet argued that the shoulders were still under construction and that the contract called for a final slope ratio of 4:1. The Board of Claims found that the *Roadside Design Guide* "required" the Cabinet to erect a guardrail between the highway and the rock wall, and that its failure to do so constituted negligence. *Babbitt v. Commonwealth, Transp. Cabinet,* No. 90–1313, slip op. at 3 (Ky. Bd. of Claims, July 15, 1999). However, at another point, the opinion states that "[t]he Plaintiffs have not proven negligence on the part of the Defendant." *Id.* at 10. The Board also concluded that Mrs. Logsdon's negligence was a superseding cause that relieved the Cabinet of any liability. *Id.* The Madison Circuit Court reversed and remanded with directions to make findings with respect to damages and comparative fault, concluding that the Board was bound by its apparent previous findings of negligence on the part of both Mrs. Logsdon and the Cabinet. *Babbitt v. Commonwealth, Transp. Cabinet,* No. 99–CI–00892, slip op. at 2–3 (Madison Cir. Ct., June 5, 2002). The Court of Appeals affirmed the judgment and order of the Madison Circuit Court.

## II. TAYLOR.

The accident in *Taylor v. Commonwealth, Transportation Cabinet,* No.2003–SC–0586–DG, occurred at approximately 10:30 p.m. on April 1, 1999, when Sherry Taylor drove her 1992 Dodge Shadow automobile directly into the headwall of a concrete culvert located approximately three feet from the edge of the paved roadway at M.P. 5.620 on U.S. Highway 231 in Daviess County, Kentucky. Taylor died as a result of the collision. The culvert is located on a long, straight stretch of two-lane highway that Taylor had traversed many times in the past. The weather was clear and the road was dry. There was a black and orange striped "object sign" located directly in front of the headwall. There is no explanation for why Taylor's vehicle left the traveled portion of the roadway. Taylor's estate brought this action in the Board of Claims asserting that the Cabinet was negligent in failing to install a guardrail that would have deflected Taylor's vehicle away from the headwall, thus perhaps reducing her injuries and saving her life.

There was testimony in *Taylor* that thousands of existing roadside hazards in

Kentucky could be made more safe by the erection of guardrails. While guardrails are always installed when highway sections are newly constructed or reconstructed, many more roadside hazards exist on roadways that, like highway 231, were constructed decades ago. Appellant concedes that deficits in both money and manpower make it impossible to immediately erect guardrails at all of those sites. In fact, there was evidence that in one recent fiscal year, no money at all was available for guardrail improvements in Kentucky. To accommodate this fiscal limitation, the Transportation Cabinet attempts to identify and prioritize all existing roadside hazards that could be improved by guardrails and to erect those guardrails piecemeal as funds become available. Taylor's estate argues that the Cabinet was negligent in not giving this particular headwall a higher priority. Specifically, it identifies eight similar headwalls alongside highway 231, all located within four miles of M.P. 5.620, against which the Cabinet erected guardrail protections in 1996, leaving only the headwall at M.P. 5.620 unprotected.

In June 1989, Jerry G. Pigman (the Commonwealth's expert in *Babbitt* ) and Kenneth R. Agent (the Commonwealth's expert in *Taylor* ), both research engineers at the Kentucky Transportation Center, completed a research project requested by the Transportation Cabinet, the purpose of which was to establish a logical approach to the identification and prioritization of Kentucky's guardrail needs based on degree of hazard and available funds. The project produced a report entitled *Warrants and Guidelines for Installation of Guardrail* (*"Warrants & Guidelines"*). The report was never officially adopted by statute or regulation; however, it was "implemented" by a letter dated May 17, 1990, from the Kentucky State Highway Engineer to the Division Administrator for the Federal Highway Administration. The letter contains a disclaimer that the implementation applies "only to maintenance activities and new installations of guardrail on existing roadways. Guardrail standards for new construction and for reconstruction, rehabilitation and restoration are not affected."

The *Warrants & Guidelines* created a hazard-index point system for evaluating the degree of hazard, consisting of a maximum of 100 possible points broken down as follows:

| CHARACTERISTICS | RATING POINTS POSSIBLE |
| --- | --- |
| 1) Number of run-off-road accidents | 15 |
| 2) Run-off-road accident rate | 15 |
| 3) Traffic volume (ADT) | 10 |
| 4) Speed limit or prevailing speed | 10 |
| 5) Lane and shoulder width | 10 |
| 6) Roadside recovery distance | 10 |
| 7) Embankment slope | 10 |
| 8) Embankment height | 10 |
| 9) Culvert presence | 5 |
| 10) Subjective roadside hazard rating | 5 |

Charles Briggs, engineering branch manager of the Cabinet's division of operations in Frankfort, testified that each local district identifies and creates a hazard-index rating for each roadside hazard in the district. (There are twelve districts; Sherry Taylor's accident occurred in district 2.) The district engineer then submits a list of the district's guardrail priorities to the division of operations. The list may or may not correlate with the hazard-index points assigned to each hazard. In other words, the district engineer may give a hazard with fewer index points a higher priority than a hazard with more index points. The Cabinet has a policy that each proposed budget will include at least one guardrail project in each of the twelve districts. The Cabinet admits the policy is politically motivated to facilitate adoption of its proposed budget by the General Assembly. To that extent, a project with fewer hazard-index points in one district may receive a higher priority than a project with more hazard-index points in an-

other district. Further, a district with a mountainous terrain will naturally have more hazardous roadside conditions than a district with a relatively flat terrain. Thus, a hazard given a tenth priority in a mountainous district might have more hazard-index points than a fourth priority in, *e.g.*, district 2, where the terrain is relatively flat, thus posing fewer roadside hazards. However, the projects approved within each district are prioritized solely on the basis of the hazard-index points. Only if two projects within the same district have the same hazard-index points does the district engineer's personal priority receive preference.

Other considerations in prioritizing guardrail needs are available funds and cost-effectiveness, *i.e.*, how much improvement can be accomplished with the funds available. The *Warrants & Guidelines* summarize the procedures for identifying and prioritizing locations in need of guardrails as follows:

1) Development of critical numbers and rates of run-off-road accidents;

2) Preparation of a list of locations with critical rates of run-off-road accidents;

3) Development of a hazard-index point system;

4) Conducting a field survey;

5) Tabulation of hazard-index points;

6) Determination of improvement costs;

7) Determination of improvement benefits;

8) Analysis of cost-effectiveness.

On February 1, 1996, Hosea Brown, a civil engineer and Cabinet employee assigned to district 2, conducted a field survey of the roadside hazard presented by the culvert at M.P. 5.620 on highway 231. He gave the culvert and headwall only forty hazard-index points, primarily be-cause there had been no prior run-off-road accidents at the site, thus no points could be assigned for the first two categories, *i.e.*, number of accidents and accident rate.[4] When the district engineer submitted his priority list to the division of operations, he listed the culvert headwall at M.P. 5.620 *and* the three headwalls to the north of the culvert jointly as his fourth priority. The five headwalls to the south of M.P. 5.620 were listed jointly as his tenth priority. When the division of operations released its guardrail budget for fiscal year 1996–1997, it included only three projects for district 2. The three headwalls to the north of the culvert at M.P. 5.620 were jointly listed as its first priority and the five headwalls to the south of the culvert were jointly listed as its second priority. (The third and last priority was a nine-mile stretch of guardrail in Union County.) Briggs explained that the three headwalls north of the culvert were located between 3.2 and 3.8 miles north of M.P. 5.620, but within 0.6 miles of each other, so that one span of guardrail 0.6 miles in length would provide protection against all three; and that the other five headwalls were located between 1.3 and 1.8 miles south of M.P. 5.620, but within 0.5 miles of each other, so that one span of guardrail 0.5 miles in length would provide protection against all five.

On the basis of this evidence, the Board of Claims could have resolved whether the Cabinet had a duty to erect a guardrail at M.P. 5.620 prior to April 1, 1999, and whether its failure to do so constituted negligence. Instead, the Board interpreted language in *Commonwealth Transportation Cabinet v. Shadrick*, 956 S.W.2d 898 (Ky.1997), as holding that the Cabinet has no duty whatsoever to protect negligent

---

4. No evidence was adduced as to the hazard-index points assigned to the other headwalls alongside highway 231 that were guardrailed in 1996.

motorists from colliding with roadside hazards that are in plain view. "There was no evidence in the record that would indicate that Sherry Taylor's leaving the roadway was due to anything other than her failure to exercise due care for her own safety." *Taylor v. Commonwealth, Transp. Cabinet*, No. 99–1035, slip op. at 4 (Ky.Bd. Claims, Dec. 20, 2001) (emphasis added). The Daviess Circuit Court and the Court of Appeals both affirmed.

### III. SUBCONTRACTOR DEFENSE.

The Cabinet's first defense in *Babbitt* was premised upon KRS 44.073(15), which provides:

> Neither the Commonwealth nor any of its cabinets, departments, bureaus, or agencies or any officers, agents, or employees thereof shall be liable under a respondeat superior theory or any other similar theory for the acts of independent contractors, contractors, or subcontractors thereof or anyone else doing work or providing services for the state on a volunteer basis or pursuant to a contract therewith.

That may very well have been a valid defense to the claim pertaining to the absence of rumble strips, because there was evidence that Allen Company had paved over the 310 feet of missing strips. However, the Cabinet's witnesses admitted that it was the duty of the Cabinet, not Allen Company, to repaint the right edge line between the right southbound lane and the paved shoulder. The Board made no findings with respect to either of these claims of negligence. The Cabinet's contract with Allen Company did not call for the erection of a guardrail between the shoulder of the road and the ditch adjacent to the rough-cut rock wall. The Cabinet's defense to this issue was that its failure to erect a guardrail at that location did not constitute negligence. As noted earlier, the Board found both ways on this issue.

### IV. LIABILITY.

KRS 44.120 provides that the Board of Claims may make an award to a claimant if "the *damage* claimed was caused by such negligence on the part of the Commonwealth or its agents as would entitle the claimant to a judgment in an action at law if the state were amenable to such action." (Emphasis added.) KRS 411.182(2) requires the trier of fact to determine the extent of "the causal relation between the conduct of each party ... and the *damages* [sustained] ...." (Emphasis added.) Thus, the Board was required to determine whether the Cabinet had a duty to install guardrails at either accident site, and/or to place rumble strips and a right edge line at the I–75 accident site; and, if so, whether its failure to do so constituted negligence; and, if so, the percentage of causation of each claimant's *damages* (not causation of the *accident*) attributable to its failure to do so. Obviously, the failure to erect a guardrail did not cause either of these vehicles to leave the highway, though the absence of rumble strips and/or a right edge line could be found to have contributed to cause Logsdon's vehicle to have done so. However, the failure to erect a guardrail might have contributed to the degree of damages sustained in either or both accident(s). While there is some language in *Commonwealth Transportation Cabinet v. Shadrick*, 956 S.W.2d 898 (Ky.1997), that could be interpreted otherwise, comparative fault, as defined in KRS 411.182, applies to actions brought in the Board of Claims.

*Shadrick* upheld a finding by the Board of Claims that the Transportation Cabinet owed no duty to traveling motorists to remove a vehicle parked by someone else within the right-of-way, but some eight and one-half feet from the traveled portion

of the highway. Finding negligence only on the part of the party who parked the vehicle and the operator of the vehicle that struck it, *Shadrick* held that "[i]t would be unreasonable and impractical to hold the Department responsible for the negligence of others." *Id.* at 901. *Shadrick* did state that "[t]he Department's duty with respect to the maintenance of roads is to maintain them in a reasonably safe condition for those members of the traveling public *exercising due care for their own safety."* *Id.* at 900 (emphasis added). In the context of the facts in *Shadrick,* that meant only that the Department was not required to remove vehicles parked by someone else in the right-of-way unless they obstructed the traveled portion of the highway where persons exercising due care for their own safety would be operating their vehicles. It did not mean that the long-discarded doctrine of contributory negligence as a complete defense applies to claims against highway authorities in Kentucky. The cases *sub judice* are easily distinguishable from *Shadrick* because the Commonwealth presumably created the ditch and the rough-cut rock wall struck by Logsdon when it constructed I–75, and it clearly erected the culvert headwall struck by Taylor.

We also agree with the Madison Circuit Court and the Court of Appeals that the Board of Claims misapplied the concept of superseding cause. "A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." *Donegan v. Denney,* 457 S.W.2d 953, 958 (Ky.1970) (quoting Restatement (Second) of Torts § 440 (1965)). The Board reasoned that Judy Logsdon's negligence in driving the motor home off the roadway superseded any negligence on the

part of the Cabinet, thus precluding any liability of the Cabinet for the damages sustained by Larry Logsdon and the Benders' estates. We disagree. In the first place, the rationale for the doctrine of superseding cause has been substantially diminished by the adoption of comparative negligence.

> The advent of more refined tools for apportionment of liability—comparative responsibility, comparative contribution, and substantial modification of joint and several liability—also has undermined one important rationale for these rules: the use of scope of liability to prevent a modestly negligent tortfeasor from being held liable for the entirety of another's harm when the tortious acts of other, more culpable persons were also a cause of the harm.

Restatement (Third) of Torts, Liab. for Phys. Harm § 34 cmt. a (Proposed Final Draft No. 1, 2005). Secondly, if the Cabinet was negligent in failing to replace the rumble strips or right edge line, or in failing to erect a guardrail where Logsdon's motor home struck the rock wall, Logsdon's negligence was "precisely the risk[ ] that render[s] tortious [the Cabinet's] failure to adopt adequate precautions." *Id.* at cmt. d. After all, a motorist who drives his or her vehicle off the traveled portion of the highway will almost always be deemed to have been contributorily negligent to some extent.

Our earliest line of cases on the subject of guardrails and barriers held that they were intended as warnings and that the highway authority had no duty to erect such obstacles for the purpose of preventing motorists from driving into rivers, off cliffs, or into roadside obstacles. *E.g., Christopher's Adm'r v. Louisville & Nashville R.R. Co.,* 259 Ky. 166, 82 S.W.2d 282, 283 (1935) ("Neither the ordinances of the city under which the highway was recon-

structed, nor the statutes, required the railroad company to erect or maintain a guard along the side of the highway or at the top of the embankment, or at all."); *City of Ludlow v. Albers,* 253 Ky. 525, 69 S.W.2d 1051, 1056 (1934) ("The city was not duty bound to erect and maintain a barrier along the edge of the embankment to prevent vehicles while using the street, going over it."); *City of Catlettsburg v. Sutherland's Adm'r,* 247 Ky. 540, 57 S.W.2d 512, 514 (1933) ("[W]here the condition is obvious and the elements of concealment of the danger or notice thereof are not involved, it is held that there is no duty to maintain a barrier of sufficient strength to resist the force of an automobile or to prevent it from going over an embankment alongside the highway, even though at a curve, presenting a hazardous condition."); *Watkins' Adm'r v. City of Catlettsburg,* 243 Ky. 197, 47 S.W.2d 1032, 1034 (1932) (same). Not only were those cases decided in an era when contributory negligence was a complete bar to recovery, they were decided in an era when vehicles were slower, traffic volume was lighter, and highways were not designed with interstate travel in mind. Thirty-six years later, our predecessor court expressed a different view about this issue.

In *Commonwealth, Department of Highways v. Automobile Club Insurance Co.,* 467 S.W.2d 326 (Ky.1971), our predecessor court upheld a Board of Claims award against the Department of Highways for its failure to erect "signs, guardrails, or barriers" at or near a sharp curve where the vehicle in which the deceased was a passenger left the roadway. *Id.* at 330. In doing so, it held as follows with respect to the duty of the highway authority to provide warnings and barriers for the protection of motorists:

> There were no signs or guardrails or other barriers such as posts at or near the curve where the accident occurred. Appellant Department contends that it is under no compulsion to place guardrails or curve signs at every curve along its highways. We agree. But it is also true that the public authority having control over a highway has a duty to keep it in a reasonably safe condition for travel, to provide proper safeguards, and to give adequate warning of dangerous conditions in the highway. This includes the duty to erect warning signs and to erect and maintain barriers or guardrails at dangerous places on the highway to enable motorists, exercising ordinary care and prudence,[5] to avoid injury to themselves and others. The appellant is under no duty to provide warning signs, guardrails, or barriers when an unusual or dangerous condition does not exist. Neither is it appellant's duty to erect guardrails or barriers of sufficient strength to withstand any degree of force. However, it is appellant's duty to furnish adequate protection for the general traveling public and users of the highway facilities.

*Id.* at 328.

Thirty-four years later, we conclude that this analysis remains sound (except for the implication that the duty is owed only to persons who are not contributorily negligent) and is in accordance with the general rule.

> The exercise of due care by highway authorities may require them to safeguard dangerous places by barriers or

---

**5.** *Automobile Club* was also decided prior to the adoption of comparative negligence in Kentucky. However, contributory negligence was not a factor in that case because the injured party was a passenger in the vehicle that left the roadway. His estate had already recovered from the driver's insurance company, which brought the Board of Claims action seeking contribution from the Department of Highways.

guard rails, but only where their absence renders the highway unsafe for travel or the road presents an extraordinary hazard.

The general rules as to liability for injury arising from a failure to maintain guard rails or barriers apply as to liability for damage to motor vehicles or injury to their occupants.... [T]he due care owed to motorists by the highway authorities may require the safeguarding of a dangerous place by the construction and maintenance of suitable barriers, guard rails or fences. While the failure to erect a barrier might not cause the accident, such a failure might be a substantial factor in aggravation of the injuries and, in that event, with proof of causation and negligence, the State will be liable.

The exercise of ordinary care is required, and guard rails need be erected only where their absence renders the highway unsafe for ordinary travel; the road presents an extraordinary condition or unusual hazard; the situation is inherently dangerous; a duty was voluntarily assumed; or the duty arises at common law or is specifically required by statute. Barriers need not be maintained where a dangerous or unusual condition does not exist.

All the circumstances are to be considered in determining whether the failure to maintain barriers or guard rails is negligence, including whether this is the accepted practice or meets relevant design standards, and the character of the road or the thinly settled nature of the community. The test is not the distance of the dangerous object or place from the highway .... Ordinarily, the authorities are not required to provide barriers to prevent travelers from straying off the way to adjoining lands upon which there may be dangerous places.

60A C.J.S. Motor Vehicles § 457 (2005) (footnotes omitted).

■■■■ Said another way, a highway authority is not automatically liable every time a motorist drives his vehicle off the traveled portion of the highway and strikes a roadside hazard. Nor does the failure to follow design guidelines, such as those recommended by AASHTO or the *Warrants & Guidelines,* constitute the equivalent of negligence *per se* (as implied by the Board in the *Babbitt* case). Whether the failure to provide warnings or to erect a guardrail at a particular location constitutes negligence on the part of the highway authority is a fact-intensive inquiry for which the various design guidelines, as well as available funds and cost effectiveness, may be considered. If a determination is made that the failure to provide warnings or to erect a guardrail constitutes negligence, the factfinder must then determine from the evidence whether the presence of warnings or a guardrail would have prevented or reduced the damages sustained by the claimant and apportion liability in accordance with KRS 411.182.

In *Babbitt,* the Board reached contradictory conclusions with respect to the issue of the Cabinet's negligence and an erroneous conclusion that Judy Logsdon's negligence was a superseding cause. It made no findings with respect to the missing rumble strips and right edge line. In *Taylor,* the Board misinterpreted *Shadrick* as completely exonerating the Cabinet when the hazard is in plain view and the driver is contributorily negligent, compelling the erroneous conclusion that Sherry Taylor's own negligence obviated any need to consider whether the Cabinet had a duty to erect a guardrail at M.P. 5.620 and, if so, whether its failure to do so contributed to cause Taylor's death, which would require an apportionment of damages.

Accordingly, we affirm in part the Court of Appeals' decision to reverse and remand *Babbitt,* but reverse that decision insofar as it concludes that the Board is bound on remand to deem the Cabinet negligent. We reverse the Court of Appeals' decision in *Taylor.* We remand both cases to the Board of Claims with directions to reconsider its decisions in accordance with the principles set forth in this opinion.

All concur.